AO 91 (Rev. 11/82)  **CRIMINAL COMPLAINT**  ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ROY WILLIAM BURRIS | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**16MJ02119** |

Complaint for violation of Title 18, United States Code, Section 922(g)(1)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALKA SAGAR | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATES OF OFFENSES<br>February 29, 2016 | PLACE OF OFFENSES<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm]

FILED CLERK, U.S. DISTRICT COURT OCT 24 2016 CENTRAL DISTRICT OF CALIFORNIA

On or about February 29, 2016, in Los Angeles County, within the Central District of California, defendant ROY WILLIAM BURRIS knowingly possessed a firearm, namely, a Springfield XD .45 caliber semi-automatic pistol, bearing serial number XD654585, in and affecting interstate and foreign commerce. Such possession occurred after defendant BURRIS had been convicted of the felony crime described in the attached affidavit, which is punishable by a term of imprisonment exceeding one year.

LODGED 2016 OCT 24 PH 3:03

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**DARIN MASTERTON**<br>OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE⁽¹⁾ | DATE<br>October 24, 2016 |
|---|---|

⁽¹⁾ See Federal Rules of Criminal Procedure 3 and 54

AUSA Cassie D. Palmer, x. 0363   REC: Detention      **ALKA SAGAR**

## AFFIDAVIT

I, Darin Masterton, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with the U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since June 2010. I currently am assigned to the HSI Los Angeles Regional Aviation Enforcement Group and have been since June 2016. My responsibilities include narcotics and bulk cash smuggling investigations involving the use of domestic commercial and private general aviation aircraft. From June 2010 to June 2016, I was assigned to the HSI Los Angeles, Gang Investigations Group, and later the Narcotics Investigations Group.

2. As part of my training, I attended the 26-week Criminal Investigator and Special Agent Basic Training Academies at the Federal Law Enforcement Training Center in Glynco, Georgia. My training included, among other things, the investigation of federal violations related to trade-based money laundering, narcotics and bulk cash smuggling, weapons violations, financial crimes, transnational criminal street gangs, and other criminal and administrative violations of U.S. law. From September 1996 to June 2010, I held several Federal Immigration Enforcement Officer positions with ICE and the United States Immigration and Naturalization Service ("INS"). During my employment with HIS, I have conducted and participated in numerous drug trafficking, money laundering, and bulk cash

Instrumentality Protocol

smuggling investigations, as well as investigations involving violations of federal and state narcotics and firearms laws, criminal street gangs, national security, and immigration violations. Through these investigations, I have questioned suspects and witnesses, reviewed evidence, conducted surveillance, and executed arrest and search warrants.

## II. PURPOSES OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint against, and an arrest warrant for, Roy William BURRIS ("BURRIS") for a violation of Title 18, United States Code, Sections 922(g)(1) (Felon in Possession of a Firearm).

4. This affidavit is also made in support of a search warrant for the SUBJECT DEVICES, as described below in Attachment A, which were seized from BURRIS's person and carry-on luggage on or about February 29, 2016 at the Long Beach Airport. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of violations of Title 18, United States Code, Sections 922(g)(1) (Felon in Possession of a Firearm); Title 49, United States Code, Section 46505 (Carrying a Weapon or Explosive on an Aircraft); and Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute Controlled Substances), and 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance) (collectively, the "Subject Offenses"), and any SUBJECT DEVICE that is an instrumentality of the Subject

Instrumentality Protocol

Offenses. The items to be seized are described in Attachment B. Attachments A and B are incorporated by reference herein.

5. The facts set forth in this affidavit are based upon my personal observations, training and experience, and conversations with other law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. DIGITAL DEVICES TO BE SEARCHED

6. The SUBJECT DEVICES to be searched are described in Attachment A, which is incorporated herein by reference, and as follows: the seven cellular telephones seized by Long Beach Police Department ("LBPD") on or about February 29, 2016 from BURRIS's person and carry-on luggage at the Long Beach Airport, and currently in LBPD's custody (collectively, the "SUBJECT DEVICES").

### IV. SUMMARY OF PROBABLE CAUSE

7. On February 29, 2016, BURRIS attempted to carry a loaded firearm in his carry-on luggage through a security checkpoint at the Long Beach International Airport in Long Beach, California. BURRIS claimed ownership of backpack in which the firearm was located, as well as the firearm itself, which also was registered to BURRIS. BURRIS is a felon.

Instrumentality Protocol

BURRIS's luggage also contained seven cellular telephones and indicia of drug trafficking.

### V. STATEMENT OF PROBABLE CAUSE

A. BURRIS's Possession of the Firearm and Arrest

    8. Based on my review of Long Beach Police Report No. 16-13310, I know the following:

        a. On February 29, 2016, Transportation Security Officer ("TSO") Tjija Payton was assigned to the Transportation Security Administration ("TSA") screening checkpoint/x-ray machine in lane number 3 at the Long Beach Airport in Long Beach, California. At approximately 4:05 p.m., TSO Payton saw what she believed to be a loaded firearm inside a carry-on bag presented for screening through the lane 3 x-ray machine. TSO Payton notified her supervisor, Senior Transportation Security Officer ("STSO") Michael Banta, who then notified the Long Beach Police Department ("LBPD").

        b. LBPD Police Officer Jason Dallas responded to TSO Payton's location and viewed the image of the suspected firearm on the x-ray machine monitor. Officer Dallas then removed the bag, a black and gray backpack, from the conveyer belt. When Officer Dallas took possession of the bag, a male passenger standing in lane number 3, later identified as BURRIS, verbally identified the backpack as his. Officer Dallas looked inside the main compartment of the backpack and found a Springfield XD .45 caliber semi-automatic pistol, bearing serial number XD654585, with ten rounds of Hornady .45 caliber +P ammunition loaded into a magazine, which was inserted into the pistol.

Instrumentality Protocol

c.  Officer Dallas arrested BURRIS for bringing a firearm through an airport security checkpoint.

d.  LBPD Officer Gary Bruyere read BURRIS his <u>Miranda</u> rights via Long Beach Police form 1000.008. BURRIS waived his rights and agreed to speak to Officer Bruyere.

e.  BURRIS said that he had forgotten the pistol inside his bag, but that he carried it for security work. BURRIS claimed that he had a guard card and weapons permit, but did not have either in his possession. BURRIS said he was on probation for sale of marijuana in Kentucky, and that he also had $2,700 in cash and numerous old debit cards that were "just left over debit cards in his bag."

f.  A search of BURRIS's person and backpack revealed the following items:

   i.  $2,912 in United States ("U.S.") currency, $2,420 of which was located inside the backpack in a bundle wrapped with rubber bands, and the $490 located inside BURRIS's wallet;

   ii.  A United States Passport in the name of Roy William BURRIS, number 483086359;

   iii. Two $500 Mexican peso bills (inside BURRIS's passport);

   iv.  One $2 U.S. bill (inside BURRIS's passport);

   v.  Nine Visa debit gift cards and three personal bank cards in BURRIS's name;

Instrumentality Protocol

    vi. Seven mobile telephones of various makes and models (six of which were located in BURRIS's backpack and one of which was located on his person);

    vii. Miscellaneous papers with handwritten numbers and money signs;

    viii. California Identification Card number B8627349, in the name of "Tauruson McMillian," who is deceased.

  g. Officer Bruyere asked BURRIS about the numerous telephones and debit gift cards. BURRIS was unable to give Offier Bruyere a credible reason why he possessed so many telephones and debit gift cards. Officer Bruyere also asked BURRIS about the California Identification Card in McMillian's name. BURRIS claimed that McMillian was a close friend.

9. On March 2, 2016, I asked HSI Los Angeles Task Force Officer ("TFO") Scott Padin to run the serial number of the firearm found in BURRIS's possession through the California Automated Firearms System. TFO Padin did so and advised me that the firearm is registered to BURRIS.

## B. BURRIS Prior Felony Conviction

10. On March 8, 2016, I obtained certified conviction records for BURRIS's conviction from County Prosecutor Andrew Beckman, Jefferson County Circuit Court, Commonwealth of Kentucky. I also reviewed BURRIS's criminal history using an HSI database. From my review of these records, I learned that BURRIS has the following felony conviction:

  a. On or about January 22, 2015, Trafficking in Eight or More Ounces but Less than Five Pounds of Marijuana, in

Instrumentality Protocol

violation of Kentucky Revised Statute, Chapter 218A, Section 1421, case number 14CR2821.

C. **Interstate Nexus of Firearm and Ammunition**

11. On March 8, 2016, I spoke with Alcohol, Tobacco, and Firearms ("ATF") Special Agent David Hamilton, who told me the following:

    a. He is a certified expert in firearms and ammunition interstate nexus.

    b. On March 8, 2016, SA Hamilton reviewed the LBPD report describing the firearm and ammunition in this case, and a photograph of the firearm and the ammunition.

    c. Based upon his training and experience and the research he conducted, SA Hamilton determined that the Springfield XD .45 caliber semi-automatic pistol, bearing serial number XD654585, was not manufactured in California. Therefore, because this the firearm was recovered in California, there is probable cause to believe that the firearm necessarily moved in interstate or foreign commerce.

    d. Based upon his training and experience and the research he conducted, SA Hamilton determined that the ten rounds of Hornady .45 caliber +P ammunition were not manufactured in California. Therefore, because the ammunition was recovered in California, there is probable cause to believe that the ammunition necessarily moved in interstate or foreign commerce.

Instrumentality Protocol

D.  **Review of Long Beach Airport Security Footage**

12. On March 22, 2016, I reviewed the Long Beach Airport Closed Caption Television security footage that captured this event. The footage shows BURRIS approaching the TSA checkpoint and placing his backpack onto the TSA x-ray system for screening. BURRIS later is seen claiming the backpack after TSO Payton and Office Dallas discovered the loaded firearm.

E.  **Review of Items in BURRIS's Possession**

13. On March 22, 2016, at the Long Beach Police Department, I reviewed items found in BURRIS's possession at the time of his arrest, including the firearm, ammunition, seven mobile telephones (including four flip telephones), miscellaneous papers, nine Visa gift cards, and a black cloth lanyard attached to a green swatch with the name "MALVERDE" and the facial image of "Jesus Malverde", embroidered on the swatch. Based upon my training and experience, I believe these items are consistent with drug trafficking activities, as follows:

   a.  BURRIS possessed seven mobile phones, four of which are "flip-phones," which are commonly used by drug traffickers because they are much less expensive and easier to dispose of and replace than are smartphones. Narcotics traffickers utilize telephones and smartphones to facilitate narcotics trafficking. Traffickers often switch telephones regularly in order to avoid law enforcement detection. In addition, traffickers often utilize multiple telephones at once to compartmentalize their narcotics activities. For example, narcotics traffickers will utilize one telephone solely to

Instrumentality Protocol

communicate with narcotics customers, another telephone to communicate with narcotics couriers, another telephone to communicate with a narcotics stash location manager and transaction broker, and another telephone to communicate with narcotics source supply. This is done to attempt to avoid law enforcement detection and interception.

  b. BURRIS possessed a lanyard with the image of "Jesus Malverde." In my training and experience, I know that "Jesus Malverde" is a fictional character known in the drug trafficking world as the "Patron Saint of Narco Traffickers." I also know that in the drug trafficking world, it is commonly believed that prayers to "Jesus Malverde" and/or displaying or possessing his image, can ensure safe passage of narcotics and narcotics traffickers.

  c. BURRIS possessed twelve pieces of paper with hand-written, itemized monetary figures and balances with tallies in the thousands and hundreds of thousands of dollars. Some of these figures had balances either paid out or owed to or from "Stonie," "Taco," "Cowboys," "Jimmy," "Pauly," and "GW." Based upon my training and experience, I recognized these papers as "pay and owe" sheets, or drug ledgers, used by drug traffickers to memorialize amounts of money paid and owed for drugs.

  d. BURRIS possessed $2,420 in cash in his backpack in a bundle wrapped with rubber bands. In my training and experience, narcotics trafficking couriers often bundle set denominations and qualities of U.S. currency (from narcotics

Instrumentality Protocol

proceeds) by using rubber bands to facilitate the movement of large sums of U.S. currency between parties, and as to not comingle narcotics proceeds owed to a narcotics source of supply with the profits of an individual narcotics trafficker or personal monies. These bundles of currency are also known to be used to pay for transportation and/or hotel and rental car fees while visiting other cities to facilitate narcotics and narcotics proceed shipments.

    e. BURRIS possessed nine Visa gift cards. Based upon my training and experience, and conversations with other experienced narcotics investigators, I know that because drug proceeds usually are not safely disposed of legitimately (i.e. declared as taxable income), it is common for drug traffickers to attempt to legitimize the drug trafficking profits through the use of banks and financial institutions and their attendant services including pre-paid ATM/debit cards, securities, traveler's checks, cashiers' checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, safety deposit boxes. I also know that drug traffickers commonly believe that storing drug proceeds in such a manner will be less likely to raise suspicions by financial institutions, and in turn, law enforcement. Drug traffickers often load multiple ATM/pre-paid debit cards with funds as a means of moving narcotics proceeds in excess of $10,000. Because debit cards are small in size, they are significantly easier to transport and conceal than large sums of U.S. currency.

Instrumentality Protocol

## F. TRAINING AND EXPERIENCE AS TO SUBJECT OFFENSES

14. Based on my training and experience, and conversations with other experienced narcotics investigators, I am familiar with how drug traffickers use electronic devices to facilitate drug trafficking. Specifically, I know that drug traffickers often communicate with their criminal associates using telephones, cellular telephones, pre-paid telephones, radios, pagers, tablet computers, and laptop computers, and these digital devices often contain information such as contact numbers, messages, or other records that are relevant to the commission of criminal offenses. Further, I know that during drug-related communications, traffickers often use coded or cryptic language to disguise the nature of their conversations, including on electronic devices. I am aware that more sophisticated drug trafficking networks now utilize email, smart phone devices, Voice over Internet Protocol, video chat, internet messaging services, and social networking sites to communicate with one another. Drug traffickers often use multiple phones to conduct their narcotics-related activities, so as to isolate drug suppliers from customers and associates and from other members of their drug trafficking organization. Drug traffickers also often store evidence of their criminal activity on cellular phones, personal data assistants, or other digital devices, such as smart phones, in forms that may be as simple as customer lists or as elaborate as banking data tracking deposits from narcotics-related transactions. In light of the popularity of hand held electronic devices, narcotics

Instrumentality Protocol

traffickers often utilize them to generate, transfer, count, record and/or store all types of information relating to drug trafficking and any other illegal activities. Drug traffickers commonly possess, maintain, and keep evidence of their criminal activity (i.e., telephone numbers and names of co-conspirators; correspondence; shipping documents; receipts; and drug ledgers noting prices, quantities, and times drugs were obtained, transferred, sold, distributed, and concealed) close to them or on their electronic devices. Moreover, I know that drug traffickers typically maintain these records long after the initial transaction is completed, for accountability purposes to their superiors and to assist in collecting payment for the drugs (which are often supplied on credit). These ledgers and tally sheets are commonly referred to as "pay and owe" sheets. Since drug proceeds are not usually safely disposed of legitimately (i.e. declared as taxable income), it is common for drug traffickers to keep records of these monies on their person or near them, in a safe location, frequently on their electronic devices or in their residences, vehicles, and/or near the location at which they store narcotics or conduct drug operations. Therefore, based on my training and experience, I believe that it is likely that the SUBJECT DEVICES will contain electronic evidence relating to the possession, purchase, sale, transportation, or distribution of narcotics.

15. In addition to the foregoing facts, based upon my training and experience, and conversations with other firearms investigators, I have learned that many people keep mementos of

their firearms, including digital photographs or recordings of themselves possession or using firearms on their cell phones/smart phones, computers, flash drives and portable hard drives. I also know that it is common for prohibited individuals who purchase and/or unlawfully possess firearms illegally to have photographs of firearms they or other prohibited individuals possess on their cellular telephones/smart-phones and other digital dives as they frequently send these photos to each other to boast of their firearms possession and/or the facilitate sales or transfers of firearms. Therefore, based on my experience, I believe that it is likely that the SUBJECT DEVICES will contain electronic evidence relating to BURRIS's unlawful possession of a firearm.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

16. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

   a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific

Instrumentality Protocol

expertise in the type of digital device, operating system, and software application being searched.

        b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.   Because the requested search warrant addresses seven different SUBJECT DEVICES, it is anticipated that many gigabytes of data may need to be searched to identify records called for by the requested search warrant. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

        d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive

Instrumentality Protocol

until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital

Instrumentality Protocol

15

devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was

not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

    a. Due to the number of SUBJECT DEVICES that need to be searched, i.e., seven different cellular telephones, a forensic review of the devices may take longer than usual to complete.

    17. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

    18. For the reasons described above, I respectfully submit there is probable cause to believe that Roy William BURRIS has violated Title 18, United States Code, Sections 922(g)(1) (Felon in Possession of a Firearm). I further submit there is probable cause to believe that fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Sections 922(g)(1) (Felon in Possession of a Firearm); Title 49, United States Code, Section 46505 (Carrying a Weapon or Explosive on an Aircraft); and Title 21, United States Code, Sections 841(a)(1)

Instrumentality Protocol

(Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute Controlled Substances), and 843(b) (Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance) will be found on the SUBJECT DEVICES.

_____
Darin L. Masterton, Special Agent
Homeland Security Investigations

Subscribed to and sworn before me
this 24th day of October 2016.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE